Let's make space. Sai v. Stamelos Sai v. Stamelos Sai v. Stamelos   Stamelo having the witness  Here is your witness, Mr v. Strapelos. Ms. Strapelos Good morning, all of you. Mr. Stamenlos Yes. Counsel, please state the name for the record and what party you're representing. Vince Keating on behalf of the appellant, Sandy Sai. Steven Macousas on behalf of the attorney on the case of Stamelos. George Sangelis on behalf of the young guy who's a writer. Okay, are both of you going to argue? I will be arguing. Did you say your name again? Steven Macousas S-M-I-K-U-Z-I-S Alright, 15 minutes. Thank you. Rebuttal? Please. Okay, alright. Alright. Alright, you may proceed. Members of the court, Vince Keating on behalf of the appellant, Sandy Sai. The trial court's judgment is in error because Stamelos had an inadequate remedy of law. This court, this case is that simple. Count one of the Stamelos counterclaims sought a judgment against Ms. Sai on the basis of unjust enrichment. In response, Ms. Sai filed a 2-6-15 motion to dismiss for failure to state a claim. The trial court denied the motion and the trial court's denial of that motion is in error for three different reasons. One Can I interrupt for one second? Sure. Did you answer? Yes. You filed an answer? Yes, we did. Now, normally when you file an answer, doesn't that waive any defects in the pleading when you go on to trial? The cases cited in the appellant's brief indicate that once the judgment is rendered and the case is on appeal, a motion to dismiss can be revisited on appeal on the basis in its de novo review. What cases say that, that you've cited? You didn't discuss that, right? I believe I did, Your Honor. I apologize. I hadn't anticipated that. I apologize. I will pull that out and answer that on rebuttal if that's okay. All right. That's fine. The trial court's denial is in error for three reasons. One, there was an adequate remedy at log. Two, there's an underlying cause of action. And three, Ms. Sy did not have an independent duty to act. All three of these rationales also apply to the trial court's judgment, the difference being on the motion to dismiss, which is taken by this court under de novo review, and the evidence induced at trial for these three very same reasons would be reviewed under the manifest evidence standard and or de novo review with regards to any legal claims that may have any legal analysis that may apply to those claims. With regards to an unjust enrichment claim, the party must plead and prove an enrichment, an impoverishment, relation between the enrichment and the impoverishment, the absence of justification, and the absence of a remedy at log. The ICD Publication Court held because it is an equitable remedy, unjust enrichment is only available where there is no adequate remedy at log. The Season Comfort Court held that it is axiomatic that an unjust enrichment claim is viable only when there is no adequate remedy at log. Count one alleges unjust enrichment. However, the allegations in that count and the evidence induced at trial indicate that Ms. Stemelos had an adequate remedy at log. It was the contract that was attached to the counterclaim. It was the contract that was introduced into evidence, what was referred to in the briefing as Ms. Stemelos' note, and I believe was attached to her counterclaim as Exhibit D. This valid, enforceable contract is Stemelos' adequate remedy at log, and once incorporated into the contract and once introduced into evidence, bars a claim for unjust enrichment against Ms. Sy. This court in the Green case indicated, dismissed an unjust enrichment count just like here when it incorporated allegations of an enforceable agreement and also attached a copy of the contract to the complaint. And did that case involve a contract with a third party? The Ginn case did not, but the Gagnon case did, as did the Season Comfort case, and in the Season Comfort case, in fact, that was a case where the initial defendant or the primary defendant, if you would, on the adequate remedy at log filed bankruptcy, and so the plaintiff in that case decided to file an unjust enrichment claim against another solvent party, and in that case, it was held that even though the primary party had become insolvent, an unjust enrichment claim is not available because there was an adequate remedy at log, even though it's no longer available. The Gagnon case states that although the plaintiff may plead claims alternatively, breach of contract on the one hand and unjust enrichment on the other hand, the unjust enrichment cannot incorporate the terms of the contract into that claim. It makes inadequate remedy at log, and simply put, attaching the contract to the counterclaim in this case, bears a claim for unjust enrichment. In response to that argument, Snell has argued in their briefs that the available remedy at log does not preclude her from seeking equitable relief from the side because the adequate remedy at log is only available from Pecoulas and not from the side. Again, as I just stated, there is no case left to support that particular argument, and the adequate remedy at log is not limited to or only to the availability of a legal relief against a specific defendant. The court in the season comfort case that I referred to found the plaintiff's adequate remedy at log against third parties did not permit an unjust enrichment claim. That particular case, as I just stated, was there was an uncollectible debt because of a bankruptcy by one party, and that did not transfer into an unjust enrichment claim against the party who was solvent. Claims that plaintiffs have against third parties, even if the remedy becomes unavailable, constitute inadequate remedy at log. And what I believe Snell will be arguing is this idea that the counterclaim alleges that Mr. Pecoulas was no longer available because he fled the United States. That allegation, just like an allegation of bankruptcy, is not available and still constitutes inadequate remedy at log. Even taking that allegation as true, it's no different than the Sago case, which stated a party performing pursuant to a contract who is disappointed by its co-party's failure to pay generally cannot turn to a third party for compensation. They had a contract with Mr. Pecoulas. Mr. Pecoulas breached that contract or failed to pay on the note, and they had inadequate remedy at log against Mr. Pecoulas. To then try to bootstrap a claim against Ms. Sy simply because the money went from Pecoulas to Ms. Sy is not permitted because they had an adequate remedy at log. The claim also fails because the counterclaim does not... It's not the claim and the proof. Correct. Thank you. Both the claim and the evidence in that trial indicate that the claim fails because the underlying, it does not, they did not prove an underlying claim of fraud or improper conduct against Ms. Sy to support Stabella's claim for unjust enrichment. The Mulligan court tells us that unjust enrichment is not a separate cause of action that standing alone would justify recovery. Rather, it's a condition that may be brought about by unlawful or improper conduct such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct. In the Mulligan case, this district stated, where the underlying claim for fraud is deficient, we have dismissed claims for unjust enrichment. In that case, this court held the plaintiff's statutory fraud claim was defective because the plaintiff in that case did not demonstrate that she herself was deceived by the defendant's alleged fraudulent conduct. Here we don't even have that. There is no allegation, there is no proof to show that Ms. Sy deceived the Samaritans in any fashion whatsoever. The Mulligan court also held that unjust enrichment cannot form the basis of liability when there's no underlying claim to support that unjust enrichment. Here there's no allegations, there was no proof of fraud, duress, or undue influence. The only allegation is that Ms. Sy was paid some money by Mr. Pecoris after Mr. Pecoris was borrowed $550,000 from Mr. Mills. That does not constitute the type of fraud, duress, or undue influence necessary to prove and to plead an unjust enrichment claim. The Caldwell unjust enrichment claim at trial and as pled also fails because it does not establish a duty on the part of Ms. Sy. A plaintiff fails to state a claim for unjust enrichment absent an allegation of duty. In the Meredith case, the court held the plaintiff failed to allege the defendant owed him a duty. Absent such an allegation, that defendant was under a duty to plaintiff. Plaintiff failed to state a claim for unjust enrichment. Here the Caldwell claim also fails to allege the existence of a duty between Ms. Sy and Ms. Stamelis. And at trial there was a failure of any proof of a duty between Ms. Sy and Ms. Stamelis. All that's alleged that Mr. Pecoris executed a note in favor of Ms. Sy. That note was in the principal balance of $428,000 and some change. The counterclaim in the proof of trial showed that that particular note was called in default by Ms. Sy. That after executing on the collateral, there was still a balance due and owing. And the counterclaim alleges in the proof of trial indicates that a separate written agreement, the Stamelis note to Pecoris was entered into by Pecoris. And subsequent to that note, which says it's a note, it says that the money is borrowed. It indicates that it's a loan for $550,000. And after that money was given to Mr. Pecoris, pursuant to the note, $400,000 of which was paid to Ms. Sy. And whether it's the allegation in the counterclaim or what was proven at trial, that means there was not only an adequate remedy at law, but there was no duty on the part of Ms. Sy to do anything beyond that. She didn't have to look beyond the $400,000 to determine the source of that funds. There's no requirement in the law to do that. She had brought a deck action to determine who, you know, basically whose money that was, wasn't it? No, she brought a deck action because she claimed that that was her money, and she had already received a claim or an assertion by Mr. Houssakos that he was going to claim the $400,000. The evidence introduced at trial indicated there was a letter from Mr. Houssakos' attorneys to Ms. Sy indicating they were going to be filing a claim against Pecoris for breach of a contract and for unjust enrichment and weaker claims and everything else against Ms. Sy. And they were going to claim the $400,000. In response to that, and in timing with the deadline that Ms. Sy had given to Pecoris of August 31, 2012, she filed her cause of action, the first three counts of which were against Pecoris for breach of the promissory note, and the final count was his declaratory judgment action to simply ratify what she believed all along that the $400,000 was hers and on the offensive against Houssakos' anticipated claim that he was going to try to get a constructive trust or claim unjust enrichment that he was entitled to for the $400,000. The court's judgment highlights the deficiency with this particular claim for unjust enrichment and, in particular, the adequate remedy at law that's available. If you read through the judge's dissertation and her judgment, she flatly states and addresses Mr. Houssakos on that claim, Mr. Houssakos certainly suffered great hardship. Whether or not all the elements of unjust enrichment have been met, and here what I'm saying is that you definitely have a claim against Mr. Pecoris. For these reasons, Mr. Houssakos, I have to find in favor of Ms. Sy on your claim. So the trial court specifically recognized that Mr. Houssakos had an adequate remedy at law and was barred from proving or pleading an unjust enrichment claim and then turned right around and, in that same judgment, then awarded the claim for unjust enrichment against Ms. Sy and in favor of Stemelis. Without addressing the adequate remedy? Whatsoever. For Mr. Stemelis. or proof of trial, there was clearly an adequate remedy at law and therefore judgment shouldn't have been rendered against Ms. Sy and in favor of Stemelis. The other thing to bear in mind when discussing the ultimate trial court judgment is the July 28th judgment by the court. The trial court's findings here are legally inconsistent with the July 9th, 2013 judgment. The July 9th, 2013 judgment became final on August 19th, 2013. It was unchallenged by anybody and became law of the case. In the Art case, the holding states, a legal decision made at one stage of the litigation becomes law of the case for future stages of the same litigation. As such, all the parties herein are bound by that July 9th, 2013 judgment and a subsequent judgment inconsistent with that holding is prohibited. In fact, legally inconsistent judgments constitute reversible error, according to the court in the Redmond case cited in the brief. Simply put, the July 9th, 2013 judgment, the trial court found that after all offsets were applied, plaintiff in excess of $469,000, almost $470,000. The court, however, ruled later in her judgment from the bench that the trial court, the court held and informed Ms. Sy that she was not entitled to any more money. And in fact, the court is, no more money was owed. That finding is in direct contradiction to the July 9th, 2013 judgment, which found that the court owed Sy $470,000 after all offsets were applied to the obligation under the Sy note. And thereby, those two judgments are inconsistent. And because the July 9th, 2013 judgment was first, it was final, it became law of the case, and the final judgment in this case is inconsistent therewith and constitutes reversible error. All right, counsel, why don't you sum up, please? Without any kidding, the court also, in its judgment, invited, in the final judgment that was read into the record, indicated a desire to have Pecoulas at trial. The judge was offered an opportunity to do that in our motion to join Pecoulas as a party or in the alternative to dismiss the case and didn't do that. For that reason, it's reversible error. And then, because there was an adequate remedy at law, and because the judgment was inconsistent with the July 9th, 2013 judgment, the judgment entered herein is reversible error and needs to be reversed. Thank you. Thank you. Good morning, Justices of the Court. My name is Stephen McCousis, and I represent the Appellee Angeliki Stemelos. Now, this may be an unconventional beginning to an oral argument, but I'd like to share a story with you from my youth, because I think it's directly on point as to the issue that is before the trial court as well as this panel. When I was nine years old, Tommy Tully stole my bike. I didn't see him do it. My brother was crying in the front yard, and I heard him. I was inside my grandmother's house. So I went outside, and I asked him what was wrong. He said, Tommy Tully stole your bike. My God, let's go find Tommy Tully. So for the rest of the day, I ran around the neighborhood looking for Tommy. Eventually, I found him, and he was on my bike. He was with another kid from the neighborhood. They were in the same grade, Billy Murphy. Every time I got close, they laughed and kept going. I'm screaming, hey, can I have my bike back? The joke should be over. Four or five hours went on with this cat-and-mouse game. Eventually, I decided, well, hey, I know where Billy Murphy lives. I know where Tommy lives, but I know where Billy is. He's got to come home sometime. I'll wait for him at his house. So I get to Billy's house, and I went in the yard, and there was my bike. Tommy wasn't there, but Billy was. I went to Billy, and I'm like, hey, can I have my bike now? You guys had your fun. He said, that's not your bike. Tommy Tully gave it to me. That's my bike. I'm like, but Billy, my name is on the bike. It's censored right there. Mrs. Murphy was in the house and heard the commotion, because, of course, one thing led to another between me and Billy at 9 and 10 years old. She came outside, not knowing who I was. She looked at me and said, what are you doing in my yard? Why are you here? I told her my name was Steve Macousas. I told her Tommy Tully gave my bike to her son Billy, and I wanted it back. She looked at the bike. She saw my name on it. She looked at her son's face. He had this sheepish look on his face. She slapped him in the back of the head, gave me my bike, and told me to leave. Mrs. Murphy wasn't a lawyer. She wasn't a judge. In fact, she was a housewife whose substitute taught at a grade school, and I think she sang in a church choir. But even Mrs. Murphy knew that this fundamental precept that you don't keep stolen goods. And if you know who the rightful owner of those goods are, you give it back. That's the fundamental issue that the trial court had with Sandy Cy's conduct in this case. And the one thing that the appellant seems to ignore is that this case, Stemelis' claim for unjust enrichment, had everything to do with Sandy Cy's conduct. Sandy Cy's actions, not some third party's actions. It all had to do with what Sandy Cy did. Now let's think about what Sandy Cy did. Sandy Cy tells, and it's important to note, I'm arguing on the basis of not just a 615 motion to dismiss, but also that was discovered at trial. And I'm doing this just for purposes of brevity. Sandy Cy had an agreement with the Spiro-Picolas, where she lent him money to buy into this construction and port solutions company. And Spiro gave off his 50% interest as collateral towards this note so they could buy in. Spiro failed to meet his obligations. Sandy seized his interest in the company. And not once, but on two separate occasions, her lawyers told Spiro that they were done. That she was satisfied. She had his collateral. She didn't need any more money from him. Now I'm not saying that that is necessarily an election of remedies under the law. I'm not saying that Sandy Cy could have potentially pursued another cause of action down the road. But at that point in time, based on her mind, she was done with him. Their business was finished. What changed her mind? In early August, Peter Housakos goes up to her, meets her representatives in St. Louis, and tells her, hey, you know what? Wait a minute, before that, hasn't she gotten that $400,000? No, that's the thing. The money wasn't deposited in her account yet. According to the record in the testimony at trial, on August 7th, Peter Housakos travels to St. Louis, confronts Sandy Cy's representatives and says, I gave Spiro Spikolas half a million dollars for a 10% interest in construction and port solutions. Sandy's representative's response to Peter Housakos was, What are you talking about? He doesn't own the company. We own the company. He has no interest in this company whatsoever. You better go back to Spiro and talk to him about it. The record at testimony trial indicates Housakos calls Spikolas that very evening and says, hey, they claim I don't have an interest in the company. What's going on? Where's my money? He says they're lying. Exactly. And what happens two days later? $400,000 fortuitously ends up being deposited in Sandy Cy's account. Now, let's just talk. He says it's fortuitous, but the check says it's for his percent interest in that option. I mean, it's not just his $400,000. The check says what it's for. He's attempting to buy back his interest when they told him don't try to buy back the interest or we're going to pursue all of our remedies that we can. It's fortuitous in the sense that Sandy Cy took no action in order to get that money. And something to keep in mind, Spiro deposited that money directly into Sandy Cy's account. It's not like Sandy Cy received a check and had to think about what should I do with this money. She woke up one day. She woke up on August 10th to see that her bank balance was $400,000 higher than it was the day before. How do we know that? We know that Spiro's PICO has deposited the money into her account. Yeah, I mean, but I thought, didn't he, did he call her? I can't remember now. Did he call her or did he write her and say I've given you $400,000? I mean, she, it wasn't, I mean, there's nothing in the record that she discovered it on her own. Some way he told her he put the money in there. I can't remember how. I don't believe that an email of that, I don't believe an email like that was actually part of the trial record. It is certainly possible that they may have been including the email that Spiro's PICO list had produced or had written at a later date. I do know that one morning Sandy Tsai's bank balance was $400,000, was at, let's say, a couple hundred dollars the following morning, the following day, it was $400,000 higher. And you're saying Spiro's put that directly in? Yes. What about the check that Justice Lanford was talking about? The evidence of record indicates that Spiro's PICO has filled out a bank deposit slip to deposit that money directly into Sandy Tsai's account. What about the check? Along with the check. My point is, Sandy didn't receive the check. Spiro actually took that check with the bank deposit slip and put it into her account. There was no action by Sandy Tsai. This money was deposited into her account by Spiro's PICO list. Trying to buy back that option, which it was on the memo line. There was no evidence as to whether or not that was the point, but even if it was. I mean, wasn't the check introduced into evidence? The check was introduced into evidence. And doesn't it say right on the check what it's for? Your Honor, Justice Lampkin, even if that's the case, let's say that was the case. If you're Sandy Tsai, you told this gentleman that you were finished, and $400,000 is magically deposited into your account. And does she know it came from Spiro? Yes, because it's on the Spiro's PICO list check. Oh, you're talking about Spiro. I'm talking about the cheat. Yes. Okay, now I'm with you. Spiro, he deposited that check himself into her account. She doesn't know it. The money, as you say, comes from your Spiro's. We know that she knows the money came from Spiro's PICO list. She doesn't know whether it came from Peter Rusako's. But this leads to the next point of poor, of bad action, of bad conduct. A normal person's reaction would be, if someone hands me $400,000 out of nowhere, my immediate reaction is going to be, and more importantly, forget about what my immediate reaction may be, is it a reasonable conclusion to believe that maybe I should figure out who the rightful owner of this money is, especially if I'm not expecting it. She calls it bad action, right? I mean, shortly thereafter, when the guy says, when Rusako says, that's my money, and she's like, no, now I've got to litigate this, so I'm going to go and get what I'm actually entitled to, my whole $500,000, not just what the option or the company, is it CIS, will value that. True, but what did she do while that bad action was pending? She spent some of the money. She spent almost all the money. Rather, she spent it two years before she even noticed that Mimosas were involved. That's true, but don't you think at that point, you're filing a debt action asking a court of law to make a determination as to who the rightful owner of the property is. I don't care what that property is, whether it's $400,000 in cash, it's personal property, a ring, a watch, a home, a car, you don't turn around and convert those funds. And that's exactly what she did. And that is a big problem, and more importantly, beyond that, it's not unreasonable for the trial court to make a determination that that is a problem, that that is bad action. Okay, I just want to back up a little bit. Okay, so she spent the money, but then she gets a judgment from the court saying, yes, you owe me the $89,000, I mean, yes, the company's worth $89,000, and you're owing another $469,000. She still gets that information two years before she knows about the Stemculosis. So why shouldn't she take the money and set it on fire if she wants to? I mean, if she hadn't spent it already. Because her debt action was still pending. That default order that was entered against Spiros Picolis, and frankly, I think the trial court, in retrospect, if they had complete discovery before the default order was entered, I think that judgment would not exist. But it does. But it does, that's correct, and I'm not questioning that judgment. I'm not here to advocate on behalf of Spiros Picolis. That judgment was entered. That judgment did indicate that the value of the collateral that was seized from Spiros Picolis was only worth $40,000. That doesn't mean that she can use Angeliki Stemelis' money to satisfy that judgment, and that's the fundamental issue in this case. You can't steal from one person and use it to satisfy someone else's debt. I mean, if we extrapolate Sandy Tsai's conduct and ratify it and say it's okay, what would prevent me from opening up a new retail store? I'm not selling prices. I'm not selling goods at wholesale prices. I'm not selling goods at retail prices. I'm selling goods at selling prices. Let me stop you for a second. This is what the case law says. No person is unjustly enriched unless the retention of the benefit would be unjust. How is it unjust for her to keep money that a judge has told her two years earlier belongs to her or that Picolis owes her and it came, as far as she knows, out of Picolis' wallet? The problem is that, one, we didn't know where the source of that money was because the declaratory judgment action as to who the rightful owner of the $400,000 in question was still pending and was not resolved until after trial in August of 2016. That count was still pending at the time the default order was entered against Spiros Picolis. The default order entered against Spiros Picolis was due to the first three counts of Sandy Tsai's claim, which had nothing to do with who the rightful owner of the $400,000 were. Nothing in that default order states that she's entitled to keep that $400,000. All that order says is the collateral was worth $40,000, that Sandy Tsai was right to seize it, and that based on the deficiency, the fact that the collateral wasn't worth what it was worth, she was owed another $450,000 or so. And isn't it funny how that order worked out? That based on the expert witness that they produced, the report they produced, that was produced months after Sandy actually seized the collateral, that it worked out to be just in line with how much was in her bank account? It was just in line with the $400,000 that Spiros Picolis deposited into her account? My point is, Judge, while that deferred to a judgment action that was pending that Sandy filed, that Sandy filed asking the court to make a determination as to who the rightful owner was, she shouldn't have spent it. A smacks of diversion. And frankly, it also... Oh, she's... Okay, I'm sorry. It just seems strange that she has to hold the money for two years to wait to see if somebody's going to file a claim against her. If she moved her summary judgment earlier, on account four, regarding who was the rightful owner of that $400,000, maybe she would have an argument. But she didn't. And the trial court didn't resolve that until after trial. I'd like to raise a couple points because I think there's... Counsel makes assertions regarding the case law that simply are not true. And I think it's really important for the court to consider that. There is no case law cited that says the fact that a party has a contract or a legal remedy against a third party, that they cannot pursue an equitable remedy such as unjust enrichment against another. The issue, the case sees in comfort. It's, I mean... It says that just because you can't collect against somebody else, when you can't collect against somebody else, doesn't mean you get to go against somebody else. It kind of does say that, because you can't... Just because another person doesn't have the money who you have the contract with, you can't go against somebody who has money in their pocket, if they didn't do something to you. I agree with that, Justice Lankin. And that's the theory. We're not proceeding on that theory. It's not as if we have a situation where Sandy Tsai is an innocent actor here. We went after Sandy Tsai based on a claim for unjust enrichment even because of the actions of Sandy Tsai based on what we just discussed. And I think the important question is whether or not... And I understand, at least for purposes of the question and answer session here, that you disagree with me, but the question is, was it reasonable for the trial judge to find that Sandy Tsai was a bad actor, that Sandy Tsai engaged in bad conduct? Both the complaint and I think the trial proved that there was no adequate remedy at law that Angelique Eustemelos could pursue against Sandy Tsai in order to recover this $400,000. And regardless of what other type of potential claim that she may have had against Spiros Pikoulas, the fact is Sandy Tsai was the bad actor here when it came to the $400,000. The Gagan and I think it was... I mean, Gagan, Nguyen, ICD, Hayes, all of these cases had to deal with express contracts between the parties. And the issue was whether or not, since there's an express contract between the parties, whether or not an unjust enrichment claim could proceed between those very parties. They had nothing to do with claims against third parties. Even in the Season Comfort case, the holding in that case, it left a couple of different reasons. One, sure, you cannot pursue a claim for unjust enrichment against an innocent third party just because your actual target went bankrupt or was uncollectible. The issue in that case was the party who was seeking to pursue remedies against this innocent third party had remedies at their disposal. They could have pursued a statutory claim pursuant to the Illinois Mechanics Treaty Act. And more importantly, the plaintiff in that case could not allege poor conduct by their target. You know, the Stamos' gave the money to Spiros, I'm sorry. Pikoulas. Pikoulas. And according, they say that there wasn't any, that he could use it however he wanted. He was, but they were supposed to get a percentage of whatever he owned in the action. At that time, he didn't own anything. Okay. So if any fraud was committed at that stage, it wasn't by CNCSI. Then this money ends up in CNCSI's bank account through Spiros Pikoulas, right? Yes. No evidence that it came from the Stamos. And the dispute in the duck action, if any, as to who may have had a right to the $400,000 was not an issue as to whether the Stamos had an interest in it because nobody knew about them at that time. Is that correct? At that point, yes. So where's the fraud? I'm not alleging fraud. Where's the bad content? Conversion. Where's the conversion? If they've already spilled it before they even know about Stamos, that's where it could go. But that's disingenuous. You filed a claim. It's a disingenuous position for CNCSI to take. CNCSI files a claim for declaratory judgment in the circuit court hiring very good attorneys. Okay? And let's be clear about that. Okay? It's a name firm in the city. It's a name firm outside in St. Louis that ends up handling the case. And she's a sophisticated businesswoman. She has a very bright son that's handling her financial affairs. Okay? She files a duck action to make a determination. She files a duck action against Peter Rusakos, who is a long-haul truck driver, who is a whittler, okay, with a young son at home. $400,000 delay. That was money that he received as a reserve for the death of his wife. And so he invested in Spiro Spikalis. And I'm not saying that's smart or not, but the point is everything that she did in this litigation, as soon as this money, even before the litigation, as soon as this money hit her account is a sign that she was doing everything she could to keep it. She was using the law not to redress a wrong, not to right a wrong. She was using the law as an opportunity to make money. I think it's very important to see that point. She files a cause of action for declaratory judgment in St. Clair County. I mean, that's approximately five hours from Cook County where Spiro Spikalis lives, supposedly. He's gone in Greece now. We have no idea what's going on with him. Where Peter Rusakos lives, where the land that's subject to construction import solutions is located, where the money that was deposited into her account is located. The Lakeside Bank Branch, where Sandy's side of business is located here in Chicago, I believe in Chinatown. Yet she files her claim in St. Clair County. And why? To make it difficult for Peter Rusakos, who's not a man of means, to try to defend this case, to argue that he is entitled to this money. The case is subsequently transferred here up to Cook County. During this whole time that she's pursuing this cause of action, and I think it's important to consider, counsel raises an argument in his brief that I somehow went outside the record talking about when the subpoena for bank records was issued. Putting that aside, we do know that the bank records in this case were produced at some point. Whether they were produced three years into the litigation, when I first appeared in the matter, or whether they were discovered in the first few months of that complaint being filed. Sandy's side knew that there was a third party out there that had a reasonable connection to this money. And that party should have been made a party to the DEC action. The fact that the DEC action was still pending all that time, she shouldn't have spent that money. I mean, in a way, if you think about it, you have to think about the other cause of action that was alleged. It wasn't just an unjust enrichment claim. We pursued a claim for imposition of a constructive trust. Imposition of a constructive trust, you can do that with cash, as long as you can trace the exact dollars. And we could do that. The money went from Stomelos to Picos, directly to Sy. And we could trace the exact same dollars. The only way you can defeat an imposition of a constructive trust in that case is if the party cannot trace. I have to find the exact dollars. What did Sandy's side do? She started cashing out that money. Writing checks to cash in her name. That kills our ability to trace. That's bad conduct. That's poor action on her part. And it's conduct that shouldn't be rewarded. All right, counsel, why don't you sum up? There are other arguments that were raised by counsel, and perhaps I spent too much time on certain points. I think as far as inconsistent judgments, the default order and the trial judgment that was entered by the courts, they're legally consistent. The default order entered against Picos has nothing to do with the court's determination that the $400,000 rightfully belongs to Stomelos and not Sy. There was one argument that was made regarding indispensable parties. This first Picos somehow was a necessary party to the case. He was a party to the case. He was a party to the case until the trial court decided to declare a trial judgment in action a month after trial. And you can see that based not just on what I'm telling you, but based on the fact that the count four makes no distinction between Picos or Housakos. But that count is very brief. On page 10, what does he state in his opening brief? On August 31, 2012, Ms. Sy initiated a lawsuit against Picos for breach of the Sy note and sought declaratory judgment that Picos and Mr. Housakos had no right to the $400,000 payment. Picos was a party to the case until the very end. For these reasons, we ask that you affirm the trial court's order in this case. Thank you. Thank you. Thank you. Ronald? With regards to that very last argument that Picos was a party to the very end, that the case law and the rules indicate otherwise, once the default judgment was entered against Picos, he was no longer a party to the case. There were no pending claims against Picos. Housakos later filed a claim against Picos but never obtained service or process. Under Rule 105, it's clear that Picos was never a party to litigation after the default judgment. I want to get back to your question in the initial inquiry regarding whether or not we can raise a failure to state a cause of action for a failure to plead an adequate remedy at law. And I would refer you to the citations that are in Appellant's reply brief on page 6. And I quote, a failure to state a cause of action can be raised at any time by any means and cannot be waived, which is the Filippino case. And then it's a fundamental defect which can be raised at any time by any means, even for the first time on appeal, and that's the government employee's insurance case. All of those citations are on page 6 of Appellant's reply brief, and that's what I was relying on when we were discussing this during that opening argument. To kind of retrace the steps of the present counsel's argument, the story about the bank, although compelling, is not applicable here. What we're talking about is a loan that Stemeles made to Picolos. There were no strings attached to that loan. We've all seen that Exhibit D. It's the letter that indicates that $550,000 was being loaned to Picolos, and Picolos was free to do whatever he wanted with that money, and Ms. Sy had no obligation to look behind the $400,000 to see the source of those funds. The decision to go ahead and pay that money was ratified by the court in July 9, 2013, judgment that indicated very specifically she was entitled to $470,000. And the valuation that was called into question, all of that could have been taken up at the trial court. It wasn't, but for your ratification, the option that was purchased was a million-dollar option that gave the company the right to purchase specific land for a purchase price of $3.7 million, and it was undisputed that at the time of the option, that property was only worth $3 million. Hence, the company wasn't worth a whole lot of money, and that's why the judgment was in the amount of $470,000. In response to the opinion, one other point. The money was a loan from Picolos to Stemelos. Stemelos, I'm sorry, from Stemelos to Picolos. Picolos could do what he wanted with the money. If he went out and bought five cars with that money, they couldn't go to the car dealership and say, it's time to get our money back, you can take the cars back. That's what they're arguing here, and that's not proper. They can't address the fundamental problem with the claim in addition to everything else that we've already discussed. She had an adequate remedy at law. The adequate remedy at law was to sue on that note for the $550,000. Despite what counsel says, the Sago case states, point blank, an uncollectible debt because of bankruptcy by one party does not transfer onto an unjust enrichment claim against the third party who solved it. That's a quote from the case. Clearly, the Sago case also indicates your proper remedy is against the party that you contracted with. To kind of fill the gap on some points, just in closing, Ms. Tsai was notified via an email. It's exhibit K that was in the evidence at trial. It appears at volume 3A, page 205 of the record. In that email, she's notified that Mr. Peculis deposited this $400,000. I knew that there was something. I remember reading it. Into her account, and that's how she learns about it. At that time, she had already declared a default under the promissory note that Mr. Peculis signed, and she was exercising her rights there. The letters that came from her attorneys to Mr. Peculis indicate specifically if you continue to try to pay on and get the collateral back, we're going to enforce all of our rights and file an action in court to enforce those rights. Counsel makes it sound like it's a terrible thing that a plaintiff wants to file a lawsuit in their background rather than travel five hours north to file a lawsuit up there. That happens all the time. That's not improper conduct. Ms. Tsai didn't even know who Stimelis was. Indeed, nobody in the litigation knew who Stimelis was until two years into the litigation after the court had already determined $470,000 was owed by Peculis to Tsai. It was paid from Peculis to Tsai in the form of $400,000. She filed a declaratory judgment action merely to ratify her claim to that money. She never wavered. She knew that money was hers all along, and that's why she filed a claim against Peculis to get the judgment and a declaratory judgment to ratify that belief. I have nothing further. Thank you. We thank both counsels. If the court will argue a matter, we will take it under advisory.